IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MAUREEN HOWARD BOIARDI,

*Plaintiff*,

v.

Civil Action No. ELH-11-01676

MARK FREESTATE, *et al.*,

*Defendants*.

**MEMORANDUM OPINION**

Maureen Boiardi, plaintiff, suffered extensive damage to her house ("House") in Queenstown, Maryland due to a fire in February 2009. At the time of the fire, the contents of the House were not insured. As a result, Boiardi filed suit against defendant Mark Freestate and the company for which he worked, defendant Avon-Dixon Agency, LLC ("Avon-Dixon"), alleging various claims under Maryland law arising from defendants' failure to secure an insurance policy on the House. *See* Am. Compl. (ECF 47). In particular, Boiardi asserts a claim of negligence as to both defendants (Count I). And, as to Freestate, Boiardi asserts causes of action for breach of fiduciary duty (Count II); negligent misrepresentation (Count III); intentional misrepresentation (Count IV); and fraud or deceit (Count V). *Id.*[1] She seeks compensatory relief and, with regard

---

[1] This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2). Plaintiff is a citizen of Wales, Great Britain, *see* ECF 10; Freestate is a citizen of Maryland, *see* ECF 8; and Avon-Dixon Agency LLC's sole member is a citizen of Maryland, with its primary place of business in Maryland. *See* ECF 9. The amount in controversy is greater than $75,000. *See* ECF 47.

Plaintiff filed an "Amended Complaint" in December 2012, which is the operative complaint. *See* ECF 47. Unless otherwise noted, references to the "Complaint" pertain to the Amended Complaint.

to Counts I, II, and III, she also seeks damages for "pain and suffering." *See* Am. Compl. ¶¶ 18, 24, 29.

At the conclusion of discovery, defendants moved for summary judgment ("Motion" or "Mot.," ECF 53), supported by a Memorandum ("Memo," ECF 53) and exhibits. Plaintiff opposes the Motion ("Opposition" or "Opp.," ECF 55), supported by exhibits,[2] and defendants have replied ("Reply," ECF 57). No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I will grant the Motion in part and deny it in part.

### Factual Summary[3]

Plaintiff and her late husband, Mario Boiardi, were long-time clients of Freestate. *See* Deposition of Mark Freestate ("Freestate Dep.," ECF 56-1) at 26; Deposition of Maureen Boiardi ("Boiardi Dep. 1," ECF 56-1) at 53–54.[4] The Boiardis purchased a home in Queenstown, Maryland in July 2000, Memo at 2; Opp. at 2, which was insured under a policy issued by Chubb Insurance Company ("Chubb"), *see* Boiardi Dep. 2 at 16, and procured by

---

[2] Plaintiff filed her exhibits collectively in one filing, so they all share the same ECF number (ECF 56-1). I refer to each exhibit separately by name or exhibit number, and all page citations are to the page of the exhibit itself.

[3] Defendants attached to their Motion a list of ten "Material Facts as to which there is no Genuine Dispute." ("Undisputed Facts"), ECF 53 at 21–22. Plaintiff does not appear to contest any of the facts proffered by defendants, other than perhaps the ninth one, which states, ECF 53 at 22 ¶ 9: "There is no admissible evidence in the record that, when Mr. Freestate spoke to Mrs. Boiardi in early January of 2009, he was hatching some scheme to trick Mrs. Boiardi into believing that she would get insurance when, in fact, she would not." Accordingly, I will consider the other nine facts to be undisputed for purposes of this Motion. *See* Fed R. Civ. P. 56(e)(2).

[4] Plaintiff was deposed on two occasions: January 16, 2012, and December 18, 2012. Both appear at ECF 56-1. I refer to the depositions as "Boiardi Dep. 1" and "Boiardi Dep. 2," respectively.

Freestate.[5]  *See* Freestate Dep. at 64, 67–68, 79.  The Boiardis paid their annual premiums to

Chubb through 2007.  *See id.*  After Mr. Boiardi passed away on November 24, 2007, plaintiff

continued to pay the mortgage on the House.  Boiardi Dep. 1 at 45.

Plaintiff claims that in the summer of 2008, she made a "$7,000 payment to Chubb by

phone."  Boiardi Dep. 2 at 16–17.  However, Chubb never received payment from plaintiff, *id.* at

17, and on August 20, 2008, Chubb cancelled the policy for nonpayment.  Opp. at 2; Memo at 2.

On September 19, 2008, Washington Mutual Bank ("WAMU"), the mortgagee on the

House, sent a letter to Mr. Boiardi, at the address for the House, stating that it had not received

notice of renewal of insurance coverage.[6]  Opp. at 2; Memo at 2.  Then, on November 9, 2008,

WAMU sent a package to the House ("November Package") that included a notice of the same

date ("Notification"), advising that WAMU had ordered lender-placed insurance coverage on the

house.  *See* Notification, Opp. Ex. 3 (ECF 56-1) at 1–2.  The lender-placed policy, which was

secured through American Security Insurance Company, had an annual premium of $10,798,

---

[5] At Freestate's deposition, plaintiff's counsel used the term insurance "broker" in questioning Freestate.  The term "broker" was previously defined in an earlier version of the Insurance Article of the Maryland Code, at § 1-101(i).  However, the definition of a broker is now subsumed within that of an "insurance producer."  *See* Md. Code, § 1-101(u) of the Insurance Article (2011 Repl. Vol.).  An insurance producer "means a person that, for compensation, sells, solicits or negotiates insurance contracts. . . ."  This definition largely comports with the definition of broker previously found in an earlier version of the Insurance Article.  *See, e.g., Green v. H & R Block, Inc.*, 355 Md. 488, 515, 735 A.2d 1039, 1054 (1999) (explaining concept of an insurance broker).

Freestate denied that he was plaintiff's insurance agent or broker at the time of the fire because he "didn't have any policies for her at the time of the fire."  Freestate Dep. at 96.  But, Freestate has not denied that he works generally as an insurance producer or broker, and he admits that he procured insurance for the Boiardis in the past.  *Id.* at 26–27.  In any event, the issue of Freestate's status as a broker is not pertinent to the disposition of the Motion.  *See* n.13, *infra*.

[6] Defendants allege that WAMU had previously sent a similar letter to Mr. Boiardi on August 25, 2008.  Memo at 2.  Plaintiff neither confirms nor denies this allegation.

which WAMU billed to an escrow account established for the mortgage loan. *Id*. at 1–3. The Notification explained: "Washington Mutual requires the maintenance of a hazard insurance policy to protect our mutual interest in your property." *Id*. at 1. It also said that the lender-placed policy will "have significantly higher premiums than standard insurance premiums because our carrier has issued the policy without the benefit of normal underwriting guidelines . . . [and] does not provide any coverage for loss or damage to personal property, loss from theft or injury to persons or property for which you may be liable, or loss due to earthquake or flood." *Id*.

Plaintiff claims that she did not see the November Package until she returned from England on or about January 8, 2009. *See* Boiardi Dep. 1 at 49. Upon learning that her Chubb policy had lapsed, plaintiff called Freestate, *see id.* at 45–46, who had served as the Boiardis' insurance broker for several years and had become "good friends" with both plaintiff and her late husband. Freestate Dep. at 27, 78. Freestate attempted to calm plaintiff and, according to plaintiff, said: "I know what's happened, send me the documents and I will take care of this." Boiardi Dep. 1 at 46. Freestate denies making this precise statement. He concedes that he told plaintiff to send him the package, but claims he said: "I will look at it and I will see what we can do." Memo at 3 n.4. However, for purposes of this Motion, Freestate does not dispute plaintiff's version of the conversation. *Id.* Plaintiff sent the November Package to Freestate on or around January 9, 2009. *See* Boiardi Dep. 1 at 48–49.

At some point after Freestate received the November Package, he placed it on the desk of Jaye Clough, the Customer Service Representative responsible for the Boiardi account.[7] Freestate Dep. at 80–83. According to Freestate, Clough was more experienced than he at securing personal lines of insurance, as Freestate was "primarily a commercial lines guy." *Id.* at 66, 83; Undisputed Facts ¶ 1. Freestate did not leave instructions with the November Package, but Clough contacted Freestate after she found it on her desk. Deposition of Jaye Clough ("Clough Dep.") at 33–34. Freestate asked Clough to find a new insurance policy for plaintiff. *Id.*; Undisputed Facts ¶ 2.

In the insurance industry, houses and communities are assigned ratings based on their access to fire protection services. *See* Deposition of plaintiff's expert, David Charon ("Charon Dep.") at 49. The House was rated Protection Class 10 ("PC-10"), which is the "worst" rating a house can receive. *Id.*; Undisputed Facts ¶ 4. Additionally, according to Clough and defense expert John Darlington,[8] obtaining an insurance policy for a home is more difficult after a homeowner's previous policy is cancelled for nonpayment and a lender places a forced insurance policy on the house. *See* Clough Dep. at 44; Deposition of John Darlington ("Darlington Dep.") at 104–5.

Clough contacted two insurance providers about coverage for the House. Undisputed Facts ¶ 5. The first, All Risks, is a non-standard insurance carrier that generally is willing to insure risks that standard carriers will not. *Id.* All Risks declined to provide coverage on the House. *Id.* Clough also requested a quote through the website of American International Group

---

[7] Plaintiff contends that Freestate did not give the package to Clough until nine days after he had received it in the mail. Opp. at 3. Defendants do not comment on this allegation.

[8] Defendants refer to Darlington as their standard of care expert. *See* Memo at 5.

("AIG") and contacted AIG employee Michael Reid. *Id.* ¶ 6; Clough Dep. 36–38. Reid initially declined to offer coverage because of the house's PC-10 rating. Undisputed Facts ¶ 6. But, on January 23, 2009, he indicated that AIG would consider writing the policy and sent Clough a proposal. *Id.*; AIG Proposal, Memo Ex. E at 1–4. At the time, however, "AIG did not know that Mrs. Boiardi's policy had been terminated for non-payment and she had a force placed policy." Undisputed Facts ¶ 7. Darlington opined at his deposition that AIG would have declined to insure the House once it learned about the previous cancellation of coverage for non-payment. Darlington Dep. at 105. Charon, on the other hand, could not provide an opinion "to a reasonable degree of certainty, as to whether or not insurance coverage could be secured" for the House. Charon Dep. at 63. In any event, Clough did not follow up with Reid (or plaintiff) about the proposal. *See* Clough Dep. 50–51. However, Reid emailed Clough on January 29, 2009, to ask if she had "any updates" for him. *See* Reid Email, Opp. Ex 8 at 1. Clough did not respond to the email. *See* Clough Dep. at 51.

On February 5, 2009, a fire broke out in plaintiff's garage and caused extensive damage to the House and its contents. *See* Boiardi Dep. 1 at 85–86; Opp. at 3; Memo at 3. That morning, Clough learned about the fire "when someone called to report" it. Clough Dep. at 52. At the time of the fire, Freestate was on vacation. Freestate Dep. at 98. The next day, Clough sent emails to Avon-Dixon CEO Terry Mead and to Avon-Dixon Claims Manager Ivory Buck. Opp. Exs. 9–10, ECF 56-1. In her email to Mead, Clough stated:

> I thought I'd better contact you right away—Mark is not in town and MRS Boiardi had a terrible fire last night according to her neighbor—We had mrs boiardi insured through Chubb and she did not pay her renewal and they would not reinstate the policy—she has had forced placed insurance through her mtgee Washington Mutual—and I have been working with AIG since late January to see

- 6 -

about getting it insured, but had not gotten it secured!!  It is a huge loss—I feel at fault because I had not gotten her place insured—HELP, PLEASE!!

Opp. Ex. 9, ECF 56-1 (all misspellings and errors in original).  Clough's email to Buck was to the same effect.  *See* Opp. Ex. 10, ECF 56-1.

On February 23, 2009, Reid—apparently unaware of the fire—again emailed Clough to follow up on the proposal he had sent on January 23, 2009.  Opp. Ex. 11, ECF 56-1.  This time, Clough responded:

I'm sorry, Michael—I should have gotten back to you sooner!  Mrs Boiardi had a fire at her house 2/4[th] (I believe)—newspaper said it did 100,000 worth of damage to her attached garage and room above garage and 200,000 in content damage (she had two cars in garage)—so I have left it alone.  I felt terrible that we hadn't firmed up the coverage, but am happy that AIG didn't have the loss as well.  It was an electrical fire according to the fire marshall.

*Id.* (all misspellings in original).

On October 5, 2009, WAMU sent a check to the House in the amount of $445,086.40.  Memo at 5; Opp. at 4.  The check, issued by American Security Insurance Company, represented payment for the loss covered by the lender-placed policy obtained by WAMU.  Memo at 5; Opp. at 4.[9]  According to plaintiff, the check represented payment only for the structural damage to the House, but did not constitute payment for the plaintiff's loss of personal property.  Opp. at 4.  Defendants claim that the check was made payable to "the Estate of Mario Boiardi," Memo at 5, but plaintiff avers that it was made payable to "Mario Boiardi."  Opp. at 4.  Neither party has produced the check.  In any event, plaintiff claims that she was living in England at the time the check was sent and did not find out about the check until March 2010, when her niece found it in the mail she had been collecting while plaintiff was away.  Opp. at 4.  At plaintiff's instruction,

_____

[9] Defendants allege that WAMU had previously sent a similar letter and check to the House on August 27, 2009.  Memo at 5.  Plaintiff neither confirms nor denies the contention.

plaintiff's niece sent the check to plaintiff's counsel "sometime after March 15, 2010." *Id.* According to plaintiff's counsel, he was unable to cash the check or have it reissued in plaintiff's name before the House was sold in a foreclosure sale on or about October 28, 2010.[10] *See id.* at 4–5; Memo at 6. Although it is not entirely clear from the record, it appears that plaintiff never received the funds sent by American Security Insurance Company.

Plaintiff avers that after the fire, she lived with friends and relatives throughout the United States and in England. Opp. at 4; *see* Boiardi Dep. 2 at 108–9, 138. According to plaintiff, she "suffered from depression and despondency as a result of the loss from the fire and not having insurance to take care of her needs. Her emotional distress became so severe that she attempted to take her own life." Opp. at 4 (citations omitted). At her deposition, plaintiff described her suicide attempt, Boiardi Dep. 2 at 137:

> I foolishly went out drinking, and I figured that I could drowned [sic] my sorrows. It didn't happen that way because I was on sleeping medication, and I had been drinking, and I took some sleeping medication, and the rest is history. I ended up on life support machine [sic] in the hospital. I was intubated, and I was in intensive care for several days where they thankfully saved my life."

The following deposition testimony of plaintiff is also pertinent, *id.* at 139–40:

Q: Do you know why you did it? Is it because they told you to go home [to Wales] and you didn't like the prospect of going home?

A: No. Not that, Counselor. Embarrassment, shame. I can't think of another word, but pure, pure embarrassment. When neighbors, who were supposed to be your friends, start asking you: Aren't you embarrassed to be staying in a hotel? Aren't you embarrassed that you're living this way? Surely to God you must have known. Well, the only thing I can say is: No, I didn't know.

---

[10] In a status report on January 8, 2013, defendants asserted that plaintiff's counsel is a "necessary witness in the case and should not act as an advocate at trial pursuant to Maryland Rule of Professional Conduct 3.7." *See* ECF 50. On January 9, 2013, I stated that "there is no need to resolve Mr. Ingram's continued representation of plaintiff prior to or during the summary judgment phase." ECF 52.

Q: Must have known what?

A: Must have known that my husband -- -- that the house wasn't in my name. And endless questions. People ask endless questions. How come? Everybody had an opinion of what I should do.

After the suicide attempt, plaintiff spent two weeks in the hospital. *Id.* at 138. While there, plaintiff did not see a psychiatrist or psychologist, but attended "meetings" in which "you sit down and you tell them what just happened in your life . . . ." *Id.* at 139. Following her discharge from the hospital, plaintiff did not receive any mental health treatment, nor did she take any antidepressants or other medication. *Id.* at 138, 195. Moreover, plaintiff testified that, at the time of her deposition, she did not have any mental health problems. *Id.* at 196.

Additional facts will be included in the discussion.

## Standard of Review

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. It provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith, Radio Corp.*, 475 U.S. 574, 586 (1986). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment, the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U. S. at 247-48 (emphasis in original). The Fourth Circuit has explained: "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a genuine issue for trial. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there is a dispute of material fact that precludes summary judgment. *Liberty Lobby*, 477 U.S. at 248.

In resolving a summary judgment motion, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. However, "[i]t is the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp.*, 477 U.S. at 323–24).

## Discussion

As noted, Boiardi alleges negligence as to both defendants (Count I). And, as to Freestate, she alleges breach of fiduciary duty (Count II), negligent misrepresentation (Count

III), intentional misrepresentation (Count IV), and fraud or deceit (Count V). ECF 47. To facilitate my analysis, I will begin with Count II.

### 1. Breach of Fiduciary Duty (Count II)

Count II purports to state a cause of action against Freestate for breach of fiduciary duty under Maryland law. *See* Am. Compl. ¶¶ 20–23.[11] Freestate insists that "Maryland does not recognize a separate tort action for breach of fiduciary duty." Memo at 7 (citing *Int'l Bhd. Of Teamsters v. Willis Corroon Corp. Of Maryland*, 369 Md. 724, 728 n.1, 802 A.2d 1050, 1052 n.1 (2002); *Kann v. Kann*, 344 Md. 689, 713, 690 A.2d 509, 520-21 (1997)). Although Freestate's assertion sweeps broadly, I agree that in this case any purported breach of fiduciary duty does not "constitute a stand alone nonduplicative cause of action." *Wasserman Goldsten Family LLC v. Kay*, 197 Md. App. 586, 631–32, 14 A.3d 1193, 1219 (2011).

"A fiduciary relationship exists when one party is under a duty to act or give advice for the benefit of another." Paul Mark Sandler & James K. Archibald, Pleading Causes Of Action in Maryland § 3.209.A, at 436 (4th ed. 2008) (citing Restatement (Second) of Torts § 874 cmt. a (1979); Restatement (Second) of Trusts § 2 cmt. b (1959)). Moreover, "[o]ne who breaches his or her duty as a fiduciary may be liable under various causes of action to those harmed by the breach of that duty." *Id.* However, the cases and commentary indicate that under Maryland law, a claim for breach of fiduciary duty exists only "where the breach is alleged as an element of the

---

[11] The law of the forum state, Maryland, guides this Court's choice-of-law analysis. *See CACI Int'l., Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009). In tort cases, Maryland courts apply *lex loci delicti*, *i.e.*, the law of the "place of the alleged harm." *See Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 726, 990 A.2d 1048, 1068 (2010). Because the alleged injuries occurred in Maryland, I look to Maryland law.

cause of action—not as a separate cause of action itself." *Id.*[12]  The Maryland Court of Appeals

stated in *Kann v. Kann*, 344 Md. 689, 713, 690 A.2d 509, 521 (1997):

> [T]here is no universal or omnibus tort for the redress of breach of fiduciary duty
> by any and all fiduciaries.  This does not mean that there is no claim or cause of
> action available for breach of fiduciary duty.  Our holding means that identifying
> a breach of fiduciary duty will be the beginning of the analysis, and not its
> conclusion.  Counsel are required to identify the particular fiduciary relationship
> involved, identify how it was breached, consider the remedies available, and
> select those remedies appropriate to the client's problem.

Later, in *International Brotherhood of Teamsters v. Willis Corroon Corp.*, 369 Md. 724,

801 A.2d 1050, (2002), the Court of Appeals explained, *id.* at 727 n. 1, 801 A.2d at 1052 n.1:

> In *Kann v. Kann*, 344 Md. 689, 713, 690 A.2d 509, 520–21 (1997), we
> pointed out that, although the breach of a fiduciary duty may give rise to one or
> more causes of action, in tort or in contract, Maryland does not recognize a
> separate tort action for breach of fiduciary duty.  Based on the underlying
> averments, IBT may have been able to plead an action for breach of contract, in
> addition to its claim for negligence, but it chose not to do so.  We shall treat the
> complaint as one for negligence.

*See also Vinogradova v. Suntrust Bank*, 162 Md. App. 495, 510, 875 A.2d 222, 231 (2005)

("[U]nder Maryland law, the two separately pleaded claims in [the] complaint," *i.e.*, a claim for

negligence and a claim for breach of fiduciary duty, "condense to only one: the claim based on

the tort of negligence.").

To be sure, the post-*Kann* landscape has been a bit muddled.  In *McGovern v. Deutsche*

*Post Global Mail, Ltd.*, Civ. No. JFM–04–0060, 2004 WL 1764088, at *12 (D. Md. Aug. 4,

2004), Judge Motz stated:

---

[12] Paul Sandler and James Archibald, the authors of *Pleading Causes of Action in
Maryland*, have said: "The circuit courts follow this interpretation, yet plaintiffs continue to
allege (unsuccessfully) breach of fiduciary duty as its own cause of action."  Sandler &
Archibald, *supra,* at § 3.209.A, at 438.

Courts have not entirely agreed on how to interpret the language of *Kann*. *Compare Swedish Civil Aviation Admin. v. Project Mgmt. Enterprises, Inc.*, 190 F.Supp.2d 785, 801 (D. Md. 2002) (breach of fiduciary duty can be part of other causes of action, but no independent tort for breach of fiduciary duty, especially if alternative remedies available), *Kerby v. Mortgage Funding Corp.*, 992 F.Supp. 787, 803 (D. Md. 1998) (no universal tort of breach of fiduciary duty, at least where other remedies exist), *and Bresnahan v. Bresnahan*, 115 Md. App. 226, 235, 693 A.2d 1, 5 (1997) ("in light of Kann, it is doubtful that *Hartlove [v. Maryland School for the Blind*, 111 Md.App. 310, 681 A.2d 584 (1996), *vacated,* 344 Md. 720, 690 A.2d 526 (1997),]'s creation of an independent tort of breach of fiduciary tort [sic] has survived") (dictum), *with Garcia v. Foulger Pratt Develop., Inc.*, 155 Md.App. 634, 682, 845 A.2d 16, 44 (2003) (*Kann* means that whether there is a tort for breach of fiduciary duty must be determined on a case-by-case basis), *and BEP, Inc. v. Atkinson*, 174 F.Supp.2d 400, 405–06 (2001) (plaintiff did state claim for breach of fiduciary duty because requirements set forth in *Kann* were satisfied).

Further, Judge Motz observed that, "[e]ven in cases where it appeared that courts were recognizing the tort of breach of fiduciary duty, the breach of the particular fiduciary duty at issue actually constituted a separate, cognizable cause of action," such as breach of the duty of loyalty between employer and employee or agent and principal. *Id.* at *12. He concluded: "I am persuaded that a careful reading of *Kann* and its progeny leads to the conclusion that breach of fiduciary duty can give rise to a cause of action—that is, it can be a component of a cause of action—but it cannot be a cause of action standing alone." *Id.*

The recent case of *Kay*, *supra,* 197 Md. App. 586, 14 A.3d 1193, is also instructive. There, the plaintiff sought, *inter alia,* money damages for breach of contract, negligence, and breach of fiduciary duty. *Id.* at 631, 14 A.3d at 1219. The Maryland Court of Special Appeals noted that Maryland law does not, at present, "obliterate the possibility of a separate cause of action for breach of fiduciary duty *in an action seeking equitable relief.*" *Id.* (emphasis added). However, "*[i]n a claim for monetary damages at law* . . . an alleged breach of fiduciary duty may give rise to a cause of action, but it does not, standing alone, constitute a cause of action."

*Id.* (emphasis added). In affirming the circuit court's ruling to dismiss that count, the court concluded that the allegations in the plaintiff's breach of fiduciary duty claim were "relevant to other causes of action," such as the breach of contract or negligence causes of action, but they did not "constitute a stand alone nonduplicative cause of action." *Id.* at 631–32, 14 A.3d at 1219.

As the cases and commentary make clear, any purported breach of fiduciary duty for monetary damages cannot, standing alone, constitute a separate and distinct cause of action under Maryland law for a tort called breach of fiduciary duty. To be sure, Freestate may have owed a fiduciary duty to plaintiff, and the alleged breach of fiduciary duty may buttress plaintiff's negligence claim. But, it simply does not give rise to a cause of action of its own. Accordingly, I will grant summary judgment to defendants with respect to Count II.

### 2. Causation (Counts I, III, IV, & V)

Defendants assert that they are entitled to summary judgment on Counts I, III, IV, and V of plaintiff's Amended Complaint because defendants' actions were not the cause of plaintiff's injuries. Memo at 13–14. Specifically, defendants argue that because of the House's PC-10 rating and Chubb's previous cancellation of plaintiff's policy for nonpayment, no insurer would have provided plaintiff with an insurance policy. *Id.* Accordingly, the argument goes, even if defendants had acted diligently and honestly, plaintiff would have remained uninsured and would have suffered the same loss. *See id.*

Plaintiff counters that, under Maryland law, the burden of proving that insurance coverage would have been unavailable is on the defendant broker, rather than on the plaintiff. Opp. at 9–10. And, according to plaintiff, defendants have not met that burden. *Id.* Defendants agree that they shoulder the initial burden of proof but maintain that they have met their burden

by offering "competent evidence on the issue." Reply at 8. According to defendants, "it became [plaintiff's] burden to produce some material evidence that demonstrates the existence of a genuine factual dispute. Instead, Mrs. Boiardi offers nothing." *Id.*

In Maryland, "to assert a claim in negligence, the plaintiff must prove: '(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.'" *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 212-13, 60 A.3d 1, 10 (2013) (quoting *Lloyd v. Gen'l Motors Corp.*, 397 Md. 108, 131-32, 916 A.2d 257, 270-71 (2007)) (emphasis omitted); *accord Schultz v. Bank of Am., N.A.*, 413 Md. 15, 27, 990 A.2d 1078, 1086 (2010) ("In a negligence case, there are four elements that the plaintiff must prove to prevail: 'a duty owed to him [or her] (or to a class of which he [or she] is a part), a breach of that duty, a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages.'") (quoting *Jacques v. First Nat. Bank of Maryland*, 307 Md. 527, 531, 515 A.2d 756, 758 (1986) (alterations in *Schultz*).

In *Green v. H & R Block, Inc.*, 355 Md. 488, 515, 735 A.2d 1039, 1054 (1999), the Maryland Court of Appeals explained that "'an insurance . . . broker, is one who acts as the [independent] middleman between the assured and the insurer, and who solicits insurance . . . under no employment from any special company. . . . *Ordinarily, the relation between the insured and the broker is that between principal and agent.*'" (Citation omitted) (Emphasis added in *Green*). *See also Sadler v. Loomis*, 139 Md. App. 374, 394, 776 A.2d 25, 36 (2001). Generally, an insurance agent or broker owes a duty to "'exercise reasonable care and skill in performing his duties. And if such a representative fails to do so, he may become liable

to those including his principal, who are caused a loss by his failure to use standard care.'"
*Insurance Co. of No. America v. Miller*, 362 Md. 361, 386, 765 A.2d 587, 600 (2001) (citation omitted).[13]

"When an insurance broker is employed to obtain a policy that covers certain risks and the broker fails (1) to obtain a policy that covers those risks, and (2) to inform the employer that the policy does not cover the risks sought to be covered, an action may lie against the broker, either in contract or in tort." *Willis Corroon Corp. Of Maryland*, 369 Md. at 737, 802 A.2d at 1057. Moreover, "'a broker or agent who, with a view to compensation for his services undertakes to procure insurance on the property of another, but fails to do so with reasonable diligence, and in the exercise of due care, or procures a void or defective policy * * * is personally liable to his principal for any damages resulting therefrom.'" *Lowitt v. Pearsall Chem. Corp. of Md.*, 242 Md. 245, 254, 219 A.2d 67, 73 (1966) (quoting Couch, *Insurance* 2d, § 481) (alteration in *Lowitt*); *accord CIGNA Prop. & Cas. Companies v. Zeitler*, 126 Md. App. 444, 465–66, 730 A.2d 248, 260 (1999). The tort duty of an agent or broker derives from a relationship of "confidence and trust" that an insured has placed in an "experienced and knowledgeable" insurance agent or broker. *See Jones v. Hyatt Insurance Agency, Inc.*, 356 Md. 639, 657, 741 A.2d 1099, 1109 (1999).

In order to recover damages from a broker for failure to obtain an insurance policy, a plaintiff must show that the broker's failure to obtain the policy was the proximate cause of her damages. *See Johnson & Higgins of Pennsylvania, Inc. v. Hale Shipping Corp.*, 121 Md. App.

---

[13] The issue of Freestate's status as a broker or insurance producer in regard to plaintiff is not germane to the proximate cause issue. However, I have included a general discussion of the duties of an insurance broker in order to give context to the proximate cause analysis.

426, 450–52, 710 A.2d 318, 330–31 (1998); *see also Pendleton v. State*, 398 Md. 447, 460, 921 A.2d 196, 204 (2007) (listing proximate cause as an element of negligence claim); *Griesi v. Atl. Gen. Hosp. Corp.*, 360 Md. 1, 11, 756 A.2d 548, 553 (2000) (same, as to negligent misrepresentation claim); *Bradley v. Bradley*, 208 Md. App. 249, 261, 56 A.3d 541, 548–49 (2012) (same, as to intentional misrepresentation and fraud claim).

Thus, in order for plaintiff to prevail at trial on Counts I, III, IV, and V, a factfinder must reasonably conclude that defendants' conduct was the proximate cause of plaintiff's injuries.

Under Maryland law, a plaintiff does not need to show that an insurance policy was obtainable in order to prove that a broker's failure to procure such a policy caused her loss. Rather, availability of insurance is assumed unless the defendant proves its unavailability as an affirmative defense. *United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 499 (4th Cir. 1998) (citing *Patterson Agency, Inc. v. Turner*, 35 Md. App. 651, 657, 372 A.2d 258, 262 (1977); *Lowitt v. Pearsall Chem. Corp. of Md.*, 242 Md. 245, 254, 219 A.2d 67, 73 (1966)). In other words, "[t]he burden of proving the nonavailability of insurance coverage is on the insurer or the broker, because it is an affirmative defense that is within the peculiar knowledge of those familiar with the market." *Kapiloff*, 155 F.3d at 499 (citing *Patterson Agency, Inc.*, 35 Md. App. at 655, 372 A.2d at 261).

The precise showing a broker must make to discharge its burden is not entirely clear. In *Kapiloff*, 155 F.3d 48, the district court concluded "as a matter of law that the insurance brokers' negligence could not have proximately caused the inadequacies of coverage because more adequate insurance was not available for the Kapiloffs' property." *Id.* at 499. Applying Maryland law, the Fourth Circuit reversed. *See id.* Relying on *Patterson Agency, Inc.*, 35 Md.

App. at 657, 372 A.2d at 261–62, the Fourth Circuit determined that "a broker cannot meet its burden of showing a lack of proximate cause . . . merely by showing that the insurer which it approached would not supply the insurance in question. Testimony that a particular insurer cannot supply insurance 'is a far cry from evidence demonstrating that such insurance is not elsewhere available.'" *Kapiloff*, 155 F.3d at 499 (quoting *Patterson Agency, Inc.*, 35 Md. App. at 657, 372 A.2d at 261–62).

The *Kapiloff* Court continued, 155 F.3d at 499:

[E]ven though the Kapiloffs did not have the burden of proof, they produced evidence that could create an inference that the Kapiloffs' properties could be covered with suitable insurance. First, they have produced testimony to the effect that some markets might insure large, vacant buildings. Second, they have produced evidence that lack of occupancy sometimes 'simply affect[s] the premium rate.' And third, they have produced evidence that United Capitol itself sometimes writes policies for vacant buildings that are similar to those which the Kapiloffs sought to have insured.

Of import here, the Court ruled that the plaintiffs "were not required to produce this evidence to withstand summary judgment because it is not their burden to show that coverage was unavailable in the first place." *Id.*

A few guiding principles emerge from *Patterson* and *Kapiloff*. First, the burden of proof on the issue of nonavailability of insurance coverage is on defendants. *Patterson Agency, Inc.*, 35 Md. App. at 655, 372 A.2d at 261. Second, in order to discharge that burden, defendants must do more than show that a "particular insurer cannot supply insurance." *Kapiloff*, 155 F.3d at 499. Third, if a reasonable factfinder can draw an inference that insurance was available— even if plaintiffs do not provide any evidence on the point—summary judgment for the defendants is inappropriate. *See id.* at 499.

These principles are in accord with the Supreme Court's explanation of the movant's burden of proof at summary judgment. As the Court has explained, "'the party moving for summary judgment has the burden to show that he is entitled to judgment under established principles; and if he does not discharge that burden then he is not entitled to judgment. No defense to an insufficient showing is required.'" *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 161 (1970) (quoting 6 Moore, *Federal Practice* 56.22(2) at 2824–25 (2d ed. 1966)). Put another way, a court considering a motion for summary judgment may not grant the motion simply because the nonmoving party has failed to dispute the moving party's factual assertions—at least where the burden of proof is on the moving party. Rather, the court must examine the facts presented, draw all inferences in favor of the nonmoving party, and then determine whether "the movant is entitled to [summary judgment]." Fed. R. Civ. P. 56(e)(3); *see also* Advisory Committee Note on 2010 Amendment to subdivision (e) of Rule 56 ("[S]ummary judgment cannot be granted by default even if there is a complete failure to respond to the motion . . . .").

*Adickes*, 398 U.S. 144, is instructive here. In that case, the plaintiff brought suit under 42 U.S.C. § 1983, alleging a conspiracy to deprive her of civil rights. *Id.* at 147. In particular, the plaintiff alleged that a police officer conspired with a shop employee to refuse service to the plaintiff. *Id.* In support of its motion for summary judgment, the defendant relied upon the shopkeeper's deposition testimony that he had not communicated with any police officers, and on affidavits from police officers that they had not communicated with the shopkeeper. *Id.* at 154–56. Although the plaintiff failed to offer any evidence of an actual agreement between the shopkeeper and the police, the Supreme Court reversed the district court's grant of summary judgment. *Id.* at 157–61. According to the Court, the defendant "did not carry its burden

because of its failure to foreclose the possibility that there was a policeman in the [shopkeeper's] store while [plaintiff] was awaiting service, and that this policeman reached an understanding with some . . . employee that [plaintiff] not be served." *Id.* at 157. Specifically, the officers' affidavits did not "foreclose the possibility" that they were in the store while the plaintiff was present, and the defendant did not offer an affidavit from the actual waitress who refused service to the plaintiff. *Id.* at 158. In light of the "unexplained gaps in the materials" submitted by defendant, the Court concluded that "it would be open to a jury . . . to infer from the circumstances" that an officer and a shop employee had reached an agreement. *Id.*

Similarly, defendants here have not "foreclose[d] the possibility" that plaintiff could have secured an insurance policy. Defendants proffer the following undisputed facts in support of their argument that insurance coverage was unavailable: (1) The House was rated Protection Class 10, *see* Undisputed Facts ¶ 3; (2) Plaintiff's previous policy had been cancelled for nonpayment, *see id.* ¶ 7; (3) All Risks declined to provide coverage to plaintiff, *id.* ¶ 5; and (4) Defendants' expert testified that, in his opinion, AIG would have declined to provide coverage to plaintiff once it learned of her previous cancellation for nonpayment, *id.* ¶ 8.

Although defendants show that insuring plaintiff would have been a risky proposition, defendants' materials contain "unexplained gaps" from which a reasonable jury could infer that insurance would, in fact, have been available to plaintiff. It is obvious that plaintiff previously had the ability to obtain insurance for the House, as it had been insured for years with Chubb. *See* Boiardi Dep. 2 at 17. And, the policy was cancelled for nonpayment, not because of any concern that the House posed an undue risk. To be sure, Chubb declined to reinstate its policy after plaintiff's failure to pay her premium. *See* Clough Dep. at 34. However, Chubb's initial

willingness to insure the property suggests that the PC-10 rating on the property was far from an insurmountable hurdle. Thus, a jury could infer that a policy would have been available, perhaps at a higher premium.

In addition, a jury could infer that AIG would have issued a policy to plaintiff. AIG underwriter Michael Reid was aware that plaintiff's home had a PC-10 rating, but indicated to Clough that AIG would provide coverage to plaintiff. *See* Reid Email, Memo Ex. E. According to defendants' expert, AIG would have changed its mind once it learned that plaintiff had a previous cancellation for nonpayment. *See* Darlington Dep. at 105. However, defendants failed to provide an affidavit or deposition testimony from Reid or any other AIG employee with regard to this assertion. *See Adickes*, 398 U.S. at 157–58 (citing defendant's failure to submit an affidavit from the waitress who refused to serve the plaintiff as creating an unexplained gap in the record).

Moreover, a jury could infer that plaintiff would have been able to secure a policy from the fact that the mortgagee, WAMU, was able to obtain lender-placed insurance coverage (albeit expensive coverage) from American Security Insurance Company. *See* Notification, ECF 56-1 at 1–3. Defendants fail to reconcile their contention that insurance coverage was unavailable with American Security Insurance Company's willingness to provide it.

Finally, plaintiff's expert, Charon, testified that he could not, "to a reasonable degree of certainty," provide an opinion as to whether plaintiff would have been able to obtain an insurance policy. *See* Charon Dep. at 63. A factfinder would be entitled to find Charon credible and the defense expert not credible, or to find that the defense expert was merely speculating that insurance coverage would not have been available to plaintiff.

Although defendants have proffered more evidence suggesting the unavailability of insurance than did the defendants in *Kapiloff*, I am of the view that they did not offer evidence sufficient to justify a grant of summary judgment on the issue of causation. Put another way, there exists a genuine dispute of material fact as to whether plaintiff could have obtained an insurance policy, because the facts in the record permit the inference that coverage would have been available to the nonmoving party. Therefore, I am required by Rule 56 of the Federal Rules of Civil Procedure to draw that inference and to deny summary judgment.

Because I decline to grant summary judgment on the issue of causation, I proceed to consider additional arguments related to the remaining counts.

### 3. Negligent Misrepresentation (Count III)

Plaintiff alleges that Freestate "negligently misrepresented a material fact . . . when he informed [plaintiff] that he would handle the matter of her home insurance policy, which lapsed, in the form of renewing the existing policy, or alternatively, obtaining a separate home insurance policy . . . ." Am. Compl. ¶ 25. Moreover, plaintiff alleges Freestate intended that plaintiff act in reliance on his misrepresentation, that she did rely thereon, and that she suffered damages as a result. *Id.* ¶ 26–29. Freestate does not offer any arguments in support of summary judgment with respect to Count III, other than the causation argument that I have rejected.

However, Rule 56(f)(2) permits a district court, "[a]fter giving notice and a reasonable time to respond," to grant a summary judgment motion on grounds not raised by a party. Fed. R. Civ. P. 56(f)(2). Because it appears to me that Freestate is entitled to summary judgment as to plaintiff's claim for negligent misrepresentation, on grounds not raised by him, plaintiff is hereby

given notice of my view, and the reasons for same; she will have a reasonable time to respond and to demonstrate why my view is erroneous. I explain below.

Under Maryland law, a negligent misrepresentation claim requires proof of five elements: (1) defendant owes a duty of care in communicating information to plaintiff, and negligently asserts a false statement; (2) defendant intends that plaintiff will act on the statement; (3) defendant has knowledge that plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) plaintiff justifiably takes action in reliance on the statement; (5) plaintiff suffers damage proximately by defendant's negligence. *See Heritage Oldsmobile-Imports v. Volkswagen of Am., Inc.*, 264 F. Supp. 2d 282, 290–91 (D. Md. 2003); *accord Griesi, supra,* 360 Md. at 11, 756 A.2d at 553; *Weisman v. Connors*, 312 Md. 428, 444, 540 A.2d 783, 791 (1988); *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 439 A.2d 534, 539 (1982).

A cause of action for negligent misrepresentation may arise when a defendant misrepresents past or existing facts. *See, e.g.*, *Martens Chevrolet*, 292 Md. at 337–38, 439 A.2d at 539 (negligent misrepresentation claim proper for submission to jury where defendant seller provided inaccurate financial statement to potential buyer). However, a promissory statement, such as Freestate's alleged promise to obtain insurance for plaintiff, generally cannot form the basis of a negligent misrepresentation claim. *See 200 N. Gilmor, LLC v. Capital One, Nat. Ass'n*, 863 F. Supp. 2d 480, 492 (D. Md. 2012).

A "negligent misrepresentation claim based on statements promissory or predictive in nature" is not viable "[u]nless the plaintiff puts forward evidence tending to show that the 'promisor' or 'predictor' made the statements with the present intention not to perform . . . ." *Miller v. Fairchild Indus.*, *Inc.,* 97 Md. App. 324, 346, 629 A.2d 1293, 1304 (1993). But, a

promise made with the present intention not to perform is perforce, an intentional misrepresentation, not a negligent one, and thus cannot sustain an action for negligent misrepresentation. *Id.* Put another way, "[i]n order for a negligent misrepresentation claim based upon a promise of future conduct to be actionable, the party making the representation regarding its future conduct must know, at the time it makes the representation, that it does not intend to carry out the promise—that the representation is false." *Heritage Oldsmobile*, 264 F. Supp. 2d at 291. But, if the party knows the representation to be false at the time it is made, then the claim is one for *fraudulent* misrepresentation and the negligent misrepresentation claim [is converted] into a claim for fraudulent misrepresentation. *Id.* (emphasis in original); *see also 200 N. Gilmor, LLC*, 863 F. Supp. 2d at 49.

The statement that forms the basis of plaintiff's claim—Freestate's statement that he would, in the future, "take care of" plaintiff's insurance policy—is a promissory statement relating to future conduct. Thus, under Maryland law, it is not actionable as a negligent misrepresentation.

As indicated, Freestate did not advance this argument in his motion for summary judgment. *See* ECF 53. Therefore, plaintiff is entitled to "notice and a reasonable time to respond" before the Court may grant summary judgment on this basis with respect to Count III. *See* Fed. R. Civ. P. 56(f)(2); *see also Coward v. Jabe*, 474 F. App'x 961, 963 (4th Cir. 2012) ("After giving notice and a reasonable time to respond, the district court may grant a motion for summary judgment on grounds not raised by a party. Fed. R. Civ. P. 56(f). Failure to give the required notice is reversible error."). Accordingly, plaintiff will be directed to file a submission,

no later than twenty-one (21) days from the entry of the Order, stating why summary judgment should not be granted to Freestate with respect to Count III on the grounds articulated above.

### 4. Intentional Misrepresentation/Fraud/Deceit (Counts IV & V)

Count IV of plaintiff's Amended Complaint alleges that Freestate made an "intentional misrepresentation" when he told plaintiff that he would "handle" her lapse in insurance coverage. Am. Compl. ¶ 31.[14]  Similarly, Count V of plaintiff's Amended Complaint alleges that Freestate committed "fraud or deceit" by making "a false representation of material fact" that he would "take care" of and rectify plaintiff's lapse in insurance coverage. *Id.*  ¶¶ 37–39.  Freestate counters that plaintiff has not adduced evidence sufficient for a reasonable factfinder to conclude that, when Freestate advised plaintiff that he would "take care of it," he had the present intention not to do so.  Memo at 8–12.

Claims sounding in fraud, implicate the heightened pleading standard of Fed. R. Civ. P. 9(b), which states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  *See, e.g.*, *E-Shops Corp. v. U.S. Bank N.A.*, 678 F.3d 659, 665 (8th Cir. 2012) ("Rule 9(b)'s heightened pleading requirement also applies to statutory fraud claims."); *see also Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013)

---

[14] The Amended Complaint also alleges that Freestate committed fraud "when, over the subsequent weeks following their January 9, 2009 contact, [he] failed to assure [plaintiff] in follow up conversations that the expired home insurance policy would be renewed, or alternatively, that separate home insurance would be obtained."  Am. Compl. ¶ 32.  I fail to grasp how this allegation could support plaintiff's fraud claim.  Freestate's alleged failure to assure plaintiff that he would obtain an insurance policy would only be a misrepresentation if he in fact *did* obtain property insurance for plaintiff.  But, plaintiff's entire lawsuit is premised on the fact that Freestate *did not* obtain insurance for her.

(stating that a Maryland CPA claim that "sounds in fraud, is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b)").

Under Rule 9(b), a plaintiff alleging claims that sound in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *United States ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010) (citation omitted). In other words, "'Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Crest Construction II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (citation omitted).

Rule 9(b) serves several salutary purposes:

> "First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

As noted, the plain text of Rule 9(b) permits general averment of aspects of fraud that relate to a defendant's state of mind. And, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* Moreover, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the

misrepresentation.'" *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997) (quoting *Flynn v. Everything Yogurt*, Civ. No. HAR-92-3421, 1993 WL 454355, at *9 (D. Md. Sept. 14, 1993)); *accord Gadson v. Supershuttle International*, Civ. No. AW-10-1057, 2011 WL 1231311, at * 9 (D. Md. Mar. 30, 2011).

As an initial matter, Counts IV and V of plaintiff's Amended Complaint are duplicative. Under Maryland law, "'[f]raud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement.'" *Sass v. Andrew*, 152 Md. App. 406, 432, 832 A.2d 247, 261 (2003) (citation omitted). An action for intentional (or fraudulent) misrepresentation is simply a garden variety fraud claim, and is often referred to simply as 'fraud.' *See id.*; *see also Boyd v. Hickman*, 114 Md. App. 108, 135, 689 A.2d 106, 119 (1997) ("[T]here is no basis for the intentional misrepresentation claim, referred to below as a claim for fraud."). Accordingly, I will consider Counts IV and V of plaintiff's Amended Complaint together, in light of the standard encompassed by Rule 9(b).

To prevail on a fraud claim, a plaintiff must show:

> (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Moscarillo v. Prof'l Risk Mgmt. Servs., Inc.*, 398 Md. 529, 544, 921 A.2d 245, 254 (2007) (quotation marks and citation omitted); *see also Thomas v. Nadel,* 427 Md. 441, 451 n.18, 48 A.3d 276, 282 n.18 (2012); *Hoffman v. Stamper,* 385 Md. 1, 16, 867 A.2d 276, 285 (2005); *Nails v. S & R*, 334 Md. 398, 415-16, 639 A.2d 660, 668–69 (1994). And, the plaintiff must establish

the elements of fraud "by clear and convincing evidence." *Md. Envir. Trust v. Gaynor*, 370 Md. 89, 97, 803 A.2d 512, 516 (2002).

To be actionable, a false representation "must be of a material fact." *Gross v. Sussex, Inc.*, 332 Md. 247, 258, 630 A.2d 1156, 1161 (1993). "A 'material' fact is one on which a reasonable person would rely in making a decision," *Sass*, 152 Md. App. at 430, 832 A.2d at 260, or a fact that "'the maker of the misrepresentation knows . . . [the] recipient is likely to regard . . . as important.'" *Gross*, 332 Md. at 258, 630 A.2d at 1161 (citation omitted). The "misrepresentation must be made with the deliberate intent to deceive," *Sass*, 152 Md. App. at 430, 832 A.2d at 260 (citing *VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 704, 715 A.2d 188 (1998)), and the defendant must "know[] that his representation is false" or be "recklessly indifferent in the sense that he knows that he lacks knowledge as to its truth or falsity." *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 232, 652 A.2d 1117 (1995).

A mere failure to disclose a material fact does not constitute fraud in the absence of a legal duty to disclose that inheres in certain types of transactions. This is because "Maryland recognizes no general duty upon a party to a transaction to disclose facts to the other party." *Gaynor*, 370 Md. at 97, 803 A.2d at 516. However, "[e]ven in the absence of a duty of disclosure, one who *suppresses or conceals facts which materially qualify representations made to another may be guilty of fraud.*" *Finch v. Hughes Aircraft Co.*, 57 Md. App. 190, 239, 469 A.2d 867 (emphasis added), *cert. denied*, 300 Md. 88, 475 A.2d 1200 (1984), *cert. denied*, 469 U.S. 1215 (1985).

Fraud based on active suppression or concealment of material facts or an intentional failure to disclose facts that the defendant is legally obligated to disclose is the variety of fraud

referred to as "fraudulent concealment." With respect to active suppression or concealment of facts, "Fraudulent Concealment 'is any statement or other conduct which prevents another from acquiring knowledge of a fact, such as diverting the attention of a prospective buyer from a defect which otherwise, he would have observed.'" *Lloyd v. Gen'l Motors Corp.*, 397 Md. 108, 138, 916 A.2d 257, 274 (2007). In other words, it describes a "situation where the defendant actively undertakes conduct or utters statements designed to, or that would, divert attention away from" a material fact. *Id.* at 138 n.11, 916 A.2d at 274 n.11.[15]

"'To create a cause of action, concealment must have been intentional and effective—the hiding of a material fact with the attained object of creating or continuing a false impression as to that fact. The affirmative suppression of the truth must have been with intent to deceive.'" *Fegeas v. Sherrill*, 218 Md. 472, 476-77, 147 A.2d 223, 225-26 (1958) (citation omitted); *accord Rhee v. Highland Dev. Corp.*, 182 Md. App. 516, 524, 958 A.2d 385, 390 (2008). As the *Rhee* Court explained, *id.* at 536, 958 A.2d at 396 (internal citation omitted) (alterations in *Rhee*):

> [T]he concealment or suppression [of a material fact] is in effect a representation that what is disclosed is the whole truth. The gist of the action [for fraud] is fraudulently producing a false impression upon the mind of the other party; and if this result is accomplished, it is unimportant whether the means of accomplishing

---

[15] The tort of fraudulent inducement is not at issue here. "The tort of fraudulent inducement 'means that one has been led by another's guile, surreptitiousness or other form of deceit to enter into an agreement to his detriment.'" *Rozen v. Greenberg*, 165 Md. App. 665, 674, 886 A.2d 924, 929 (2005) (quoting *Sec. Constr. Co. v. Maietta*, 25 Md. App. 303, 307, 334 A.2d 133, 136 (1975)). In other words, it incorporates all of the elements of fraudulent misrepresentation or fraudulent concealment, with the added element that the defendant's fraud led the plaintiff to enter into a detrimental contractual agreement. "In fraudulent inducement cases, a defrauded party may elect between two remedies, which are exclusive." Sandler & Archibald, *supra*, *Pleading Causes of Action in Maryland* § 3.92, at 346. "Persons who discover that they have been induced into a contract by fraud must decide, or the law will decide for them, whether unilaterally to rescind the contract or to ratify the contract and seek damages, either affirmatively or by recoupment." *Sonnenberg v. Sec. Mgmt. Corp.*, 325 Md. 117, 127, 599 A.2d 820, 823 (1992).

it are words or acts of the defendant . . . .

A "claim of failure to disclose, on the other hand, requires only that the defendant remain silent about, or omit, facts," and is not actionable unless "the defendant had a duty to disclose." *Lloyd*, 397 Md. at 138 n.11, 916 A.2d at 274 n.11. Where the fraudulent concealment claim is based on a duty to disclose, Maryland courts have formulated the elements of the cause of actions as follows:

> "(1) [T]he defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment."

*Blondell v. Littlepage*, 413 Md. 96, 119, 991 A.2d 80, 94 (2010) (quoting *Lloyd*, 397 Md. at 138, 916 A.2d at 274) (emphasis omitted).

The Maryland Court of Appeals encapsulated the foregoing principles in *Frederick Road Limited Partnership v. Brown & Sturm*, 360 Md. 76, 100 n.14, 756 A.2d 963, 976 n.14 (2000) (internal citations omitted):

> Ordinarily, non-disclosure does not constitute fraud unless there exists a duty of disclosure. Absent a fiduciary relationship, this Court has held that a plaintiff seeking to establish fraudulent concealment must prove that the defendant took affirmative action to conceal the cause of action and that the plaintiff could not have discovered the cause of action despite the exercise of reasonable diligence, and that, in such cases, the affirmative act on the part of the defendant must be more than mere silence; there must be some act intended to exclude suspicion and prevent injury, or there must be a duty on the part of the defendant to disclose such facts, if known.

Freestate is entitled to summary judgment if, in response to defendant's submissions, plaintiff has not adduced sufficient evidence from which a reasonable jury could conclude that the elements of fraud, as outlined above, are satisfied by clear and convincing evidence. *See*

*Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 267–73, 841 A.2d 828, 838–42 (2004).  Defendant argues that plaintiff has not adduced sufficient evidence to support a finding as to the second element, *see* Memo at 9–12, which provides that a defendant may be liable for fraud or deceit "'only if he knows that his representation is false, or is recklessly indifferent in the sense that he knows that he lacks knowledge as to its truth or falsity.'"  *Sass*, 152 Md. App. at 430, 832 A.2d at 260 (quoting *Ellerin v. Fairfax Savings, F.S.B.,* 337 Md. 216, 232, 652 A.2d 1117 (1995)).

When, as here, a plaintiff bases a fraud claim on a defendant's unfulfilled promise, the plaintiff at trial must prove that the defendant made the promise "'with a present intention not to perform it.'"  *Sass*, 152 Md. App. at 436, 832 A.2d at 264 (quoting *Finch v. Hughes Aircraft Co.*, 57 Md. App. 190, 232, 469 A.2d 867, 888 (1984)); *see also Gross*, 332 Md. at 258, 630 A.2d at 1162–63  ("[M]aking a promise as to a matter material to the bargain with no intention to fulfill it is an actionable fraud.").  Thus, in order to survive summary judgment on her fraud claim, plaintiff must adduce evidence from which a reasonable jury could conclude that, when Freestate told plaintiff he would "take care of it," he had no intention of actually doing so.

The Maryland Court of Special Appeals addressed this standard at length in *Sass*, 152 Md. App. 406, 832 A.2d 247.[16]  In *Sass*, the plaintiff alleged that defendant Sass committed fraud by entering into a construction contract without the present intent to perform the contract.

---

[16] Although *Sass* was before the Court of Special Appeals on appeal from a jury verdict, it provides guidance on the showing required on summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) ("[T]he inquiry under [a directed verdict motion and a summary judgment motion] is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.").

*Id.* at 436, 832 A.2d at 264.  The jury found for the plaintiff, but the Court of Special Appeals reversed, concluding that "there was insufficient evidence to establish that Sass never intended to perform."  *Id.* at 441, 832 A.2d at 267.  The court noted that plaintiff had produced no direct evidence that defendant, at the time he entered into the contract, lacked the intention to perform. *Id.* at 437, 832 A.2d at 265 ("[W]e have searched the citations in the record extract identified by appellee in support of her repeated assertions that appellant admitted he never intended to perform the Contract when he signed it; we have found no such admissions by Sass.").  It also determined that plaintiff's allegation that Sass never intended to perform the contract was belied by "undisputed testimony [that Sass] took substantial action in furtherance of the Contract . . . Sass's part performance was inconsistent with [plaintiff's] contention that, when Sass executed the Contract, he never intended to perform."  *Id.* at 437–38, 832 A.2d at 265.  Given the lack of any evidence suggesting that Sass signed the contract with the present intent not to perform, the court reversed the jury's fraud verdict.  *Id.* at 441, 832 A.2d at 267.

The same principle applies here.  Plaintiff has not proffered any evidence that Freestate never intended to obtain insurance for plaintiff.  To the contrary, the undisputed facts reveal that Freestate began to perform shortly after assuring plaintiff that he would "take care of" finding her a new policy.  For example, Freestate asked plaintiff to send him the November Package. Freestate Dep. at 79.  Then, in accordance with his usual practice, he placed the November Package on Clough's desk and asked her to obtain new insurance coverage for plaintiff.  *See* Undisputed Facts ¶ 1; Freestate Dep. at 80, 83; Clough Dep. at 33–34.  Clough, in turn, made inquiries to two insurance providers.  Undisputed Facts ¶ 5; Clough Dep. at 34–35, 38–40.

It may be that Freestate and/or Clough were not particularly thorough, but Freestate's request that Clough obtain coverage for plaintiff belies plaintiff's assertion that Freestate never intended to fulfill his promise. Put simply, there is no basis from which a reasonable jury could conclude that Freestate made his statement with the present intent not to perform it, because the undisputed facts reveal that Freestate began to perform. *See Celotex*, *supra*, 477 U.S. at 322–23 ("In our view, the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

Plaintiff attempts to salvage her claim by exaggerating the nature of Freestate's statement. According to plaintiff, Freestate's representation led her to believe that he would "*immediately* procure insurance for her home" and that he would "*personally* handle her insurance lapse." Opp. at 7–8 (emphases added). And, the argument goes, Freestate's assurances were fraudulent because he had "no intention of giving [plaintiff's] insurance lapse *immediate* attention" or "of *personally* involving himself in the process." *Id.* (emphases added). In other words, plaintiff now asserts that, even if Freestate intended to fulfill his promise to "take care of" plaintiff's insurance lapse, he still committed fraud because he never intended to do so immediately or personally.[17]

Boiardi's assertion that Freestate promised immediacy and personal action is entirely without support in the record. Although plaintiff may have believed or hoped that Freestate would handle the matter immediately and personally, plaintiff concedes that Freestate never

_____

[17] The use of the word "promise" does not imply or suggest that Freestate was under any contractual obligation, and I note that plaintiff has not alleged breach of contract.

- 33 -

explicitly said he would. Rather, according to plaintiff, Freestate said, "send me the documents and I will take care of it." Boiardi Dep. 1 at 46.

Plaintiff attempts to imbue these words with a promise of immediate action by asserting, without citation, that Freestate's statement "carried with it the burden of acting diligently." Opp. at 6–7. Therefore, plaintiff argues, Freestate impliedly promised to act diligently—and, because diligence in this case allegedly required immediate action, Freestate committed fraud if he did not intend to act immediately. *Id.* Plaintiff's attempted syllogism is missing a term. Although it may be true that (1) Freestate promised to take action and that (2) Freestate owed plaintiff a duty of diligence, it does not follow that Freestate promised to act diligently. In other words, plaintiff cannot premise her fraud claim on her assumption that Freestate meant more than he said.

Similarly, plaintiff's claim that Freestate impliedly promised personally to obtain insurance for plaintiff is without merit. Freestate's brief statement that he would "take care of it" cannot reasonably be construed as a promise to exclude his coworkers from the matter, much less to eschew established company procedures to do so. *See* Freestate Dep. at 83.

In sum, plaintiff has not proffered evidence from which a factfinder reasonably could conclude that Freestate made a promise he never intended to keep.[18] Accordingly, I will grant summary judgment to defendant on Counts IV and V.

---

[18] Additionally, plaintiff's characterization of Freestate's statement is inconsistent with her Amended Complaint, which alleges nothing about immediacy or personal involvement. Rather, the Amended Complaint, which was filed after both Boiardi and Freestate had been deposed, *see* ECF 47, 54, alleges only that Freestate "stated the matter of [plaintiff's insurance policy] *was being handled* through renewing/obtaining home insurance for her." Am. Compl. ¶ 38 (emphasis added). In other words, the Amended Complaint did not put Freestate on notice that plaintiff's claim is premised on Freestate's failure to act immediately and/or personally. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (noting that a complaint should "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'")

5. <u>Damages for Emotional Distress</u>

In her suit, plaintiff requests damages for "pain and suffering" caused by defendants' negligence, breach of fiduciary duty, and negligent misrepresentation.  Am. Compl. ¶¶ 18, 24, 29.[19]  Plaintiff does not specifically state the nature of her "pain and suffering."  But, according to her deposition testimony, she became "depressed" after the fire, Boiardi Dep. 2 at 63, and attempted to commit suicide by mixing sleeping pills and alcohol.  *Id.* at 137–38.  Further, she testified that after the suicide attempt, she spent two weeks in the hospital, although she was not treated by a mental health professional.  *Id.* at 138.  When asked why she had attempted suicide, plaintiff explained that she was embarrassed and devastated.  *Id.* at 139–41.

In their Motion, defendants argue that plaintiff may not recover damages for her "pain and suffering" because 1) plaintiff has not suffered a physical injury, 2) "plaintiff's emotional distress was not a foreseeable result of Defendants' alleged failure to procure property insurance," and 3) "Plaintiff cannot possibly prove that [her suicide attempt] was proximately caused by the alleged negligence of defendants, as opposed to the stress of the fire and the resulting damage."  Memo at 14–16.  In her reply, plaintiff responds only to defendants' first argument; she avers that she "need not have been physically injured from the fire in order to

---

(Citation omitted)); *see also Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 617 (4th Cir. 2009) (refusal by court to consider defamation claim premised on different statement than that alleged in plaintiff's amended complaint); *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009) (refusing to consider malicious prosecution claim based on different incident than that alleged in complaint).

[19] Plaintiff did not request relief for "pain and suffering" in either her claim for fraud or her claim for intentional misrepresentation.  Because I will grant summary judgment to defendants with respect to breach of fiduciary duty (Count II), I will consider the question of damages only as it relates to plaintiff's claims of negligence and negligent misrepresentation.

claim damages for emotional distress," as long as her emotional distress "is manifested objectively." Opp. at 10.

For the reasons stated below, I agree with defendants that plaintiff's emotional distress was not, as a matter of law, a foreseeable result of defendants' alleged negligence.

Under Maryland law, any "physical injury" is compensable if that injury is "'capable of objective determination.'" *Hunt v. Mercy Med. Ctr.*, 121 Md. App. 516, 524, 710 A.2d 362, 366 (1998) (quoting *Belcher v. T. Rowe Price Found., Inc.,* 329 Md. 709, 734, 621 A.2d 872 (1993)). However, "the term 'physical' is not used in its ordinary dictionary sense. Instead, it is used to represent that the injury for which recovery is sought is capable of objective determination." *Vance v. Vance*, 286 Md. 490, 500, 408 A.2d 728, 733–34 (1979). Thus, as long as emotional distress due to tortious conduct is manifested objectively, the emotional distress is deemed genuine and compensable even though the tortious conduct did not cause bodily harm. *Exxon Mobil Corp. v. Albright*, 433 Md. 303, 71 A.3d 30, 59, *modified on other grounds*, 433 Md. 502, 71 A.3d 150 (2013).[20] The requirement that the injury be capable of "objective determination" is intended to provide a "sufficient guarantee of genuineness that would otherwise be absent in a claim for mental distress alone." *Vance*, 286 Md. at 498, 408 A.2d at 732.

Generally speaking, however, emotional distress attendant to property damage is not compensable under Maryland law. *Albright*, 433 Md. at 395, 71 A.3d at 86; *see also H & R Block, Inc. v. Testerman,* 275 Md. 36, 48–49, 338 A.2d 48, 55 (1975) (stating that "Maryland decisions have generally denied compensation for mental anguish resulting from damage to

---

[20] The Court of Appeals in *Albright* granted reconsideration and modified its decision on two issues unrelated to compensatory damages for emotional distress. *See Exxon Mobil v. Albright*, 433 Md. 502, 71 A.3d 150.

property"), *abrogated on other grounds by Owens–Illinois v. Zenobia,* 325 Md. 420, 448–49, 601 A.2d 633 (1992).[21] The Maryland Court of Appeals has explained: "We adopted this rule because injury resulting from a mere damage to property was 'an unusual and extraordinary result' and is not contemplated as 'a natural and probable consequence' of the tortious act to the property." *Beynon v. Montgomery Cablevision Ltd.*, 351 Md. 460, 504, 718 A.2d 1161, 1183 (1998) (citation omitted). Thus, the distress a property owner may experience over injury to her property, including the fear of financial difficulty due to a loss in value of the damaged property, is not compensable. *Testerman*, 275 Md. at 48–49, 338 A.2d at 55; *see also Dobbins v. Washington Suburban Sanitary Comm'n*, 338 Md. 341, 351, 658 A.2d 675, 679-80 (1995) ("Consequently, it remains the law of Maryland that a plaintiff cannot ordinarily recover for emotional injuries sustained solely as a result of negligently inflicted damage to the plaintiff's property."). An exception to the rule allows recovery only when "the act occasioning the injury to the property is inspired by fraud, malice, or like motives." *Zeigler v. F. Street Corp.*, 248 Md. 223, 226, 235 A.2d 703 (1967) (citations omitted).

In *Testerman*, 275 Md. 36, 338 A.2d 48, the plaintiff taxpayers brought an action against H & R Block, seeking damages in connection with defendant's allegedly negligent preparation of plaintiffs' tax returns. *Id.* at 37, 338 A.2d at 49. At trial, the plaintiffs proffered evidence "that they had suffered mental anguish because of the 'wrongful acts' committed by" defendant, *id.* at 40, 338 A.2d at 51, but the trial court ruled the evidence inadmissible because plaintiffs had not

---

[21] The Court of Appeals in *Testerman* ruled on two separate issues: punitive damages and compensatory damages. Its ruling on the punitive damages issue was overruled in *Zenobia*, but its ruling on the compensatory damages question remains good law. *See Exxon Mobil Corp. v. Ford,* 433 Md. 426, 71 A.3d 105, 139 (2013) (relying on *Testerman*'s compensatory damages holding).

suffered a physical injury. *Id.*; 338 A.2d at 51. The Maryland Court of Appeals determined that, even if a physical injury is not required for a plaintiff to recover for mental anguish, "injuries to property could not support recovery of damages for mental anguish [in the absence of fraud]." *Id.* at 49, 338 A.2d at 55.

More recently, in *Albright*, 433 Md. 303, 71 A.3d 30, the plaintiff property owners alleged numerous causes of action against Exxon Mobil arising from a massive spill of gasoline from an underground tank. 433 Md. 303, 71 A.3d at 30. As relevant here, the jury awarded some of the plaintiffs "emotional distress damages for fear of loss of property value and fear of loss of use and enjoyment." *Id.*, 71 A.3d at 85–86. The Maryland Court of Appeals reversed the damages award, holding that, in the absence of fraud, "'emotional distress attendant to property damage is not compensable.'" *Id.*, 71 A.3d at 85–86 (citation omitted). And, because the court had also reversed the jury's finding of fraud, it proceeded to reverse the jury's award of emotional damages resulting from property damage. *Id.*, 71 A.3d at 85–86.

The present case is on all fours with *Albright* and *Testerman*. As in those cases, plaintiff alleges that defendants' negligent conduct caused damage to her property and that the property damage caused her mental anguish. Plaintiff's fraud claims are not viable. As a result, Maryland law does not permit plaintiff to recover compensatory damages for alleged "pain and suffering" caused by defendants' alleged negligent conduct. Accordingly, I will grant summary judgment to defendant on the issue of emotional damages.[22]

## CONCLUSION

---

[22] Alternatively, plaintiff's failure to respond in her Opposition to defendants' foreseeability argument constitutes abandonment of her claim. *See Ferdinand–Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010).

For the foregoing reasons, defendants' Motion is granted in part and denied in part. A separate Order, consistent with this Memorandum Opinion, follows.


Date: September 25, 2013                                    _____/s/_____

                                                           Ellen L. Hollander
                                                           United States District Judge